William C. Wilson, SBN: 149683
E-mail: bwilson@wilsongetty.com
Colin M. Harrison, SBN: 270443
E-mail: charrison@wilsongetty.com
Kim S. Cruz, SBN: 177406
E-mail: kcruz@wilsongetty.com
Ryan G. Canavan, SBN: 313990
E-mail: rcanavan@wilsongetty.com
Evan J. Topol, SBN: 274932
E-mail: etopol@wilsongetty.com
WILSON GETTY LLP
12555 High Bluff Drive, Suite 270
San Diego, California 92130
Telephone:  858.847.3237
Facsimile:   858.847.3365

Attorneys for Defendants HACIENDA C.H., Inc. dba BROADWAY BY THE SEA; erroneously sued and served as HACIENDA C.H., INC.) NAHS SOUTHWEST, INC.; and NAHS HOLDING, INC.

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELODY BIGLAY, ANGELICA ZUBIA, MELINDA SPAZIANO, AND ROMAN BIDDIX, the surviving children and successors in interest of Bonnie Lee, deceased,<br><br>     Plaintiffs,<br><br>vs.<br><br>HACIENDA C.H., INC., NAHS SOUTHWEST, INC., NAHS HOLDING, INC., NAHS EMPLOYEE STOCK OWNERSHIP TRUST, and DOES 1-100,<br><br>     Defendants. | Case No.<br><br>*[Removal from Superior Court of California, County of Los Angeles 21STCV20737]*<br><br>**DEFENDANTS, HACIENDA C.H., Inc. dba BROADWAY BY THE SEA; NAHS SOUTHWEST, INC.; and NAHS HOLDING, INC.'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**<br><br>*[Filed concurrently with Civil Cover Sheet, Certification and Notice of Interested Parties; and Request for Judicial Notice and Exhibits thereto]*<br><br>Action Filed:   June 3, 2021 |

**TO THE CLERK OF THE WESTERN DIVISION OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA:**

///

PLEASE TAKE NOTICE AND NOTICE IS HEREBY GIVEN THAT Defendants HACIENDA C.H., Inc. dba BROADWAY BY THE SEA (erroneously sued and served as HACIENDA C.H., Inc., NAHS SOUTHWEST, INC., and NAHS HOLDING, INC., (hereinafter referred to as "Defendants") hereby remove this action from the Superior Court of the State of California, County of Los Angeles, to the United States District Court for the Central District of California, Western Division.  Removal is based on federal officer jurisdiction and federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, 1442 (a)(1), and 1446.  Defendants reserve all defenses and objections to venue based on 42 U.S.C. § 247d-6d(e)(1).

In support of this Notice of Removal, Defendants state as follows:

## I.   STATEMENT OF THE CASE

1.     On or about June 3, 2021, Plaintiffs commenced this action in the Superior Court of the State of California for the County of Los Angeles entitled *Melody Biglay, Angelica Zubia, Melinda Spaziano, and Roman Biddix, the surviving children and successors in interest of Bonnie Lee, deceased v. Hacienda C.H., Inc., NAHS Southwest, Inc., NAHS Holding, Inc., NAHS Employee Stock Ownership Trust, and DOES 1-100*, Case No. 21STCV20737, wherein they assert causes of action for Elder Abuse and Neglect, Negligence/Medical Malpractice, Violation of Patient's Rights and Wrongful Death.  (See Exhibit A to RFJN.) Pursuant to 28 U.S.C. § 1446(a), true and correct copies of all process, pleadings and orders served on Defendants in the Superior Court action are attached as Exhibit A to Defendants' Request for Judicial Notice (hereinafter "RFJN").

2.     Plaintiffs, Melody Biglay, Angelica Zubia, Melinda Spaziano, and Roman Biddix, the surviving children and successors in interest of Bonnie Lee ("Decedent"), allege that Decedent, age 73, was a "elder" within the meaning of California *Welfare & Institutions Code* § 15610.27 and a resident at Hacienda C.H., Inc. dba Broadway By The Sea ("Broadway By The Sea") during the time relevant to the Complaint.  (See Exhibit A to RFJN, Complaint ¶¶ 1 and 14.)

3.     In the complaint, Plaintiffs allege that due to the wrongful acts and omissions of Defendant, Bonnie Lee became infected with COVID-19 during her residency at Broadway By The Sea and died on June 4, 2020.  (See Exhibit A to RFJN, Complaint ¶¶ 12, 53, 54, 58, and 104.)   More specifically, Plaintiffs allege that Defendants failed to prevent Bonnie Lee from contracting COVID-19 in that Defendants "failed to follow virus transmission protocols", that employees of Defendants "were not provided with necessary protective gear to prevent or reduce spread of the virus amongst the patients residing at the facility", and that "employees used Bonnie Lee's room to change gear while knowing that various residents and staff had tested positive for the virus." (Exhibit A to RFJN Complaint, ¶ 54a-c.)

4.     Plaintiffs further allege that Decedent required the use of a BiPAP machine, however, the device at Broadway By The Sea was defective. (Exhibit A to RFJN, Complaint, ¶s 19-21.)

5.     Plaintiffs' claims therefore relate to the distribution, administration or use of covered countermeasures to prevent and/or mitigate the spread of COVID-19 at Broadway By The Sea, bringing Plaintiffs' Complaint squarely within the purview of the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. §§ 247d-6d and 247d-6e (2006) (the "PREP Act"). Furthermore, Broadway By The Sea was acting under the direction of a Federal Officer with respect to its response to the during unprecedented COVID-19 pandemic.

## II.     THE PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN MET

6.     Defendant, NAHS Southwest, Inc. was served with the Complaint via substitute service effective  June 30, 2021.  Defendant, NAHS Holding, Inc., was served with the Complaint via substitute service effective July 2, 2021.  Defendant, Hacienda C.H., Inc. dba Broadway By The Sea (erroneously sued and served as Hacienda C.H., Inc.) was served with the Complaint via substitute service effective July 17, 2021. Based on information and belief, NAHS Employee Stock Ownership Trust has not been served.

-3-

7.     Defendants' Notice of Removal was filed on July 16, 2021 and is timely under 28 U.S.C. § 1446(b) as this Notice has been filed within thirty (30) days of the service date of a copy of the initial pleading setting forth the claims for relief.

8.     Removal to the Western Division of the United States District Court for the Central District of California is proper because the Complaint was filed in the Superior Court of the State of California for the County of Los Angeles, which is located within the jurisdiction of this District.  *See* 28 U.S.C. § 1441(a); and 28 U.S.C. § 84(c)(2).

9.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiffs and a copy is being filed with the Clerk of the Superior Court of the State of California for the County of Los Angeles.

## III.   JURISDICTION EXISTS UNDER 28 U.S.C. § 1331 BASED ON THE PREP ACT

10.     This case is removable under 28 U.S.C. § 1441(a) on the basis of "original jurisdiction" because Plaintiffs' Complaint asserts a claim "arising under" federal law within the meaning of 28 U.S.C. § 1331.

11.     Plaintiffs' Complaint alleges that due to Defendants' wrongful acts and omissions, Bonnie Lee became infected with COVID-19 during her residency at Broadway By The Sea and died from the virus on June 4, 2020.  (Exhibit A to RFJN, Complaint ¶2.)   Plaintiffs allege that Defendants failed to prevent Bonnie Lee from contracting COVID-19 in that Defendants failed to follow virus transmission protocols. More specifically, Plaintiffs allege that employees of Defendants "were not provided with necessary protective gear to prevent or reduce spread of the virus amongst the patients residing at the facility and employees used Bonnie Lee's room to change gear while knowing that various residents and staff had tested positive for the virus." Plaintiffs further allege that Decedent required the use of a BiPAP machine, however, the device at Broadway By The Sea was defective.  (Exhibit A to RFJN, Complaint, ¶s 19-21.)   (Exhibit A to RFJN Complaint, ¶ 54 a-c.)

12.     Such allegations relate to Broadway By The Sea's administration or use of qualified pandemic products, including BiPAP, COVID-19 testing, and personal protective equipment ("PPE") (e.g., masks, gowns, and face shields), which were used to diagnose, mitigate, prevent, treat or cure COVID-19, or to limit the harm COVID-19 might otherwise cause.  The claims therefore fall under the PREP Act, the applicability of which presents a significant federal question relating to the ongoing national emergency and COVID-19 pandemic. As such, Congress provided an exclusive remedy for the substance of the allegations, and relief sought in the Complaint, which completely preempts Plaintiffs' state law claims for purposes of federal question jurisdiction.  *See* 42 U.S.C. §§ 247d-6d, 247d-6e.

13.     The PREP Act, along with the Declaration of United States Health and Human Services ("HHS") Secretary and its several amendments, apply to healthcare providers and skilled nursing facilities, such as Broadway By The Sea,[1] with respect to the administration of countermeasures to diagnose, treat, prevent and mitigate the spread of COVID-19.

14.     As the PREP Act is a complete preemption statute, and Plaintiffs have alleged claims that fall within the purview of the Act, this Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  Federal courts have "jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint

---

[1] Defendants, NAHS Southwest, Inc., and NAHS Holding, Inc., are sued in their capacity as the owners of Broadway By The Sea.  The liability of these entities is derivative of the facility's liability and thus any defense(s) applicable to Broadway By The Sea likewise applies to NAHS Southwest, Inc., NAHS Holding, Inc., NAHS Employee Stock Ownership Trust.  (*See* Exhibit A to RFJN, Complaint ¶¶ 3-4.)

establishes either that federal law creates the cause of action *or* that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif.*, 463 U.S. 1, 27-28 (1983); *Dennis v. Hart*, 724 F.3d 1249, 1253 (9th Cir. 2013); *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475 (1998).

15.     While a plaintiff is ordinarily entitled to choose a state or federal forum, "a plaintiff may not defeat federal subject-matter jurisdiction by omitting to plead necessary federal questions", i.e., "artful pleading."  *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475.  "If a court concludes that a plaintiff has 'artfully pleaded' claims in this fashion, it may uphold removal even though no federal question appears on the face of plaintiff's complaint.  The artful pleading doctrine allows removal where federal law completely preempts plaintiff's state-law claim."  *Id.*  "The artful pleading rule applies when Congress has either (1) so completely preempted, or entirely substituted, a federal law cause of action for a state one that plaintiff cannot avoid removal by declining to plead necessary federal questions, or (2) expressly provided for the removal of particular actions asserting state law claims in state court." *Romano v. Kazacos*, 609 F.3d 512, 519 (2d Cir. 2010) (internal citations and quotations omitted).

16.     Complete preemption exists when the preemptive force of federal law is so powerful that it displaces any state law cause of action, and leaves room only for a federal claim for purposes of the "well-pleaded complaint" rule.[2] *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987); *see also NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010 (2d Cir. 2014).

### A.     The PREP Act Generally

17.     The PREP Act was enacted in December 2005 to encourage the development and deployment of covered countermeasures in response to public health

///

///

///

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

emergencies. Congress has provided that the HHS Secretary "shall lead all federal public health and medical response to public health emergencies." 42 U.S.C. § 300hh. The PREP Act gives the HHS Secretary authority to issue a declaration recommending administration of specified countermeasures and providing liability immunity to "covered persons" "against any claim of loss caused by or relating to the administration/use of such countermeasures and the management and operation of a covered countermeasures program." 42 U.S.C. § 247-6d(a)(1).

18.     In enacting the PREP Act, 42 U.S.C. §§ 247d-6d and 247d-6e (2006), Congress has provided complete preemption and immunity against suit and liability for claims such as those pled here relating to the use and administration of pandemic and epidemic products. With the PREP Act, Congress sought to alleviate liability concerns associated with delivering countermeasures to the public by providing protections for healthcare providers involved in the planning, distribution and dispensing of such countermeasures. P. Binzer, *The PREP Act: Liability Protection for Medical Countermeasure Development, Distribution, and Administration, Biosecurity and Bioterrorism: Biodefense Strategy, Practice, and Science*, Vol. 6, No. 4, 2008, at pg. 294. The liability immunity provided in the PREP Act ensures that healthcare providers and other care facilities are not subject to lawsuits which tax their time and energy, when such resources should be directed toward resident care.

19.     The PREP Act at 42 U.S.C. § 247d-6d(a)(1) provides as follows:

> Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

---

[2] Federal jurisdiction requires that only one claim be identified as a federal question. *See* 28 U.S.C. § 1367 [supplemental jurisdiction]; *see also Franchise Tax Board v. Laborers Vacation Trust*, 463 U.S. 1, 13 (1983).

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

20.     Section (b) of the PREP Act provides that if the HHS Secretary makes a determination that a disease or other health condition or other threat to health constitutes as public health emergency, the Secretary may make a declaration setting forth that subsection (a) is in effect with respect to the manufacture, testing, development, distribution, administration or use of one or more covered countermeasures under conditions as the Secretary may specify in the Declaration or an amendment thereto.  42 U.S.C. § 247d-6d(b)(1) and (4).

21.     The PREP Act further provides that *"[n]o court of the United States, or of any State, shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action by the Secretary under this subsection."*  42 U.S.C. § 247d-6d(b)(7) (emphasis added).  Thus, under the PREP Act, Congress has not only provided immunity to claims arising out of covered countermeasures, it has delegated regulatory authority to the HHS Secretary.

22.     As Congress has expressly delegated the duty to apply and interpret the Act to the HHS Secretary and explicitly precluded judicial review of the Secretary's actions, the Declaration (including all amendments thereto) of the HHS Secretary are controlling.  Alternatively, the Declaration and its amendments are entitled to *Chevron* deference.  Where Congress has expressly delegated interpretive authority to an agency, that agency's interpretative proclamations are controlling on the federal courts.  *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-844 (1984).

23.     Further, it can "be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law", especially where the agency's reasoning is valid.  *United States v. Mead Corp.,* 533 U.S. 218, 228-229 (2001).  As such, "a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise … but is obliged to accept the agency's position if Congress has not previously spoken to the

-8-

point at issue and the agency's interpretation is reasonable…." *Id.* at 229.  (Internal citations omitted); *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.")

24.     The Second Circuit in *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 507 (2d Cir. 2017), emphasized the importance of judicial deference where agency action is sound and reasoned.   Therein, the court explained that under *Chevron,* the first question is: "'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *Id.* at 507, *citing Chevron*, 467 U.S. at 842–43.  If the statutory language is silent or ambiguous, however, courts proceed to the second step, where "'the question for the court is whether the agency's answer is based on a permissible construction of the statute'" at issue. *Id.*, *citing Chevron*, 467 U.S. at 843.  If the agency's interpretation is not "'arbitrary, capricious, or manifestly contrary to the statute,'" *Id.*, *citing Chevron*, 467 U.S. at 844, the court will accord deference to the agency's interpretation so long as it is supported by a reasoned explanation, and "so long as the construction is "'a reasonable policy choice for the agency to make.'"  *Id.*, *citing Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005).

25.     Here, HHS is charged by Congress with administering the PREP Act during a national public health emergency, and the Secretary's actions are controlling in that they are not reviewable by the express directive of Congress. Moreover, HHS's interpretation that the PREP Act is a complete preemption statute is based on the framework of the PREP Act, including the purpose and scope of the Act as applied to the COVID-19 pandemic and the Act's exclusive federal remedial scheme.   This interpretation is sound and reasonable, especially since other complete preemption and original jurisdiction statutes have analogous remedial schemes involving similar dual

-9-

1   administrative and judicial remedies.

2         **B.**      ***The Declaration of the HHS Secretary for the COVID-19 Pandemic and***

3                   ***Advisory Opinions***

4         26.     On March 10, 2020, the HHS Secretary issued a Declaration invoking the

5   PREP Act for the COVID-19 pandemic.  The Declaration was effective as of February

6   4, 2020. (See Exhibit B to RFJN-85 Fed. Reg. 15198). The Secretary subsequently

7   issued an Amended Declaration under the PREP Act, which was effective as of March

8   27, 2020.   (See Exhibit C to RFJN- 85 Fed. Reg. 21012).   The Amendment added

9   respiratory protective devices approved by NIOSH (National Institute for Occupational

10   Safety and Health) as a covered countermeasure under the PREP Act.  On June 4, 2020,

11   the Secretary further amended the March 10, 2020 Declaration to clarify that covered

12   countermeasures under the Declaration include qualified products that limit the harm

13   COVID-19 might otherwise cause.  This Amendment was effective as of February 4,

14   2020.   (See Exhibit D to RFJN- 85 Fed. Reg. 35100).

15         27.     On December 3, 2020, the HHS Secretary issued a Fourth Amended

16   Declaration under the PREP Act effective as of February 4, 2020. (*See* Exhibit E to

17   RFJN- 85 Fed. Reg. 79190).  The Secretary's Fourth Amended Declaration provides that

18   "***COVID-19 is an unprecedented global challenge that requires a whole-of-nation***

19   ***response that utilizes federal-, state-, and local-distribution channels as well as***

20   ***private-distribution channels.  Given the broad scale of this pandemic, the Secretary***

21   ***amends [Section VII of] the Declaration to extend PREP Act coverage to additional***

22   ***private-distribution channels*. . . ."** (*See* Exhibit E to RFJN-85 Fed. Reg. 79194)

23   [Emphasis added.]

24         28.     The Fourth Amended Declaration specifically provides that Section VII of

25   the Declaration is amended to extend liability protection under the PREP Act to

26   "covered persons" for Recommended Activities that are related to "covered

27   countermeasures" that are:

28

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

i. Licensed, approved, cleared or authorized by the FDA (or that are permitted to be used under an Investigational New Drug Application or an Investigational Device Exemption) under the FD&C Act or PHS Act to treat, diagnose, cure, prevent, mitigate, or limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom; or

ii. A respiratory protective device approved by NIOSH under 42 CFR part 84, or any successor regulations, that the Secretary determines to be priority for use during a public health emergency declared under section 319 of the PHS Act to prevent, mitigate, or limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.

(*See* Exhibit E to RFJN-85 Fed. Reg. at 79194).

29.  The Secretary's Fourth Amended Declaration further makes explicit that there can be situations where not administering a Covered Countermeasure to a particular individual can fall under the PREP Act, including where there is ***"[p]rioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive."***  (*See* Exhibit E to RFJN- 85 Fed. Reg. at 79197) [Emphasis added].

30.  The Fourth Amended Declaration further provides that "***the Declaration must be construed in accordance with the Department of Health and Human Services (HHS) Office of the General Counsel (OGC) Advisory Opinions on the Public Readiness and Emergency Preparedness Act and the Declaration ("Advisory Opinions").  The Declaration incorporates the Advisory Opinions for that Purpose***." (*See* Exhibit E to RFJN-85 Fed. Reg. at 79191) [Emphasis added]. Thus, the Fourth Amended Declaration incorporates all OGC Advisory Opinions related to COVID-19 and the PREP Act into the Secretary's March 10, 2020 initiating Declaration.  And because Congress provides that no court or state shall have jurisdiction to review any action by the Secretary under this PREP Act and has expressly delegated interpretive authority to HHS, its interpretative proclamations in the Declaration and amendments are controlling on the federal courts, including the incorporated Advisory Opinions. Alternatively, they must be afforded *Chevron* controlling weight.

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

31.     Crucially, as discussed more completely below, Amendment Four directly acknowledges the federal interests in cases which require interpretation and application of the PREP Act:

> COVID-19 is a global challenge that requires a whole-of-nation response. **There are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005), in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private-sector entities.** (See Exhibit E to RFJN- 85 Fed. Reg. at 79191, 79194, 79197-79198). [Emphasis added]

32.     Amendment Four further explains:

> The world is facing an unprecedented pandemic. To effectively respond, there must be a **more consistent** pathway for Covered Persons to manufacture, distribute, **administer** or use Covered Countermeasures across the nation and the world. Thus, there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005), in having **a uniform interpretation of the PREP Act**. (See Exhibit E to RFJN- 85 Fed. Reg. at 79191, 79194, 79197-79198). [Emphasis added].

Thus, Amendment Four declares that the interpretation of the PREP Act is a matter of significant and substantial federal concern, and that removal of any case involving the interpretation of that Act is proper in accordance with the Supreme Court holding in *Grable*.

33.     Thereafter, on January 8, 2021, the HHS OGC issued new controlling authority in the form of Advisory Opinion 21-01, which unequivocally confirms that: (1) the PREP Act is a "Complete Preemption" Statute which confers federal question removal jurisdiction under 28 U.S.C. § 1441(a); (2) the PREP Act is invoked by allegations like those in the Complaint, including alleged inaction or failure to act; and (3) as discussed in more detail below, federal jurisdiction is separately conferred in such cases under the doctrine articulated by the United States Supreme Court in *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308 (2005), because

"ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that *the case belongs in federal court.*" (Exhibit DD to RFJN). [Emphasis added].

34. Advisory Opinion 21-01 unequivocally states that "[t]he PREP Act is a 'Complete Preemption' Statute" because it establishes both a federal and administrative cause of action as the only viable claim, and vests exclusive jurisdiction in federal court. (Exhibit DD to RFJN.)

35. Advisory Opinion 21-01 rejects the notion that immunity under the PREP Act requires actual "use" of a covered countermeasure. Specifically, it provides that "this 'black and white' view clashes with the plain language of the PREP Act, which extends immunity to *anything 'relating to'* the administration of a covered countermeasure." (Exhibit DD to RFJN, pgs. 2-3. [Emphasis added].

36. Advisory Opinion 21-01 further provides that *"a conscious decision not to use a covered countermeasure", including, but not limited to, a situation where there is* "[p]rioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declarations liability protections. (Exhibit DD to RFJN, pgs. 2-3). [Emphasis added].

37. Additionally, Advisory Opinion 21-01 explains that "program planners" are "covered persons" under the PREP Act and that "decision-making that leads to *the non-use of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act*." (Exhibit DD to RFJN, pg. 4). [Emphasis added].

38. Advisory Opinion 21-01 is binding on this court, as the HHS Secretary has now incorporated all HHS Advisory Opinions pertaining to COVID-19 into the PREP Act's implementing Declaration itself, and proclaimed that the Declaration "must" be construed in accordance with these opinions. (*See* Exhibit E to RFJN.)

///

-13-

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

39.     As confirmed in Advisory Opinion 21-01, the PREP is a complete preemption statute.  Indeed, "[t]he sine qua non of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both." (Exhibit DD to RFJN, pg. 2.)  In the Fifth Amendment to the PREP Act Declaration of the HHS Secretary, published on February 2, 2021, the acting Secretary reiterates that "[t]he plain language of the Prep Act makes clear that there is ***complete preemption of state law***…." (Exhibit CC to RFJN-86 Fed. Reg. 7872, 7874).

40.     Here, Plaintiffs' claims fall within the purview of the PREP Act.  Under the PREP Act, Congress has provided an exclusive federal remedy and exclusive federal jurisdiction for the substance of the allegations and relief sought in the Complaint thereby completely preempting State law with respect to the claims raised in the Complaint.   Moreover, Broadway By The Sea's administration of countermeasures, including BiPAP, PPE (masks, gowns, face shields), and COVID-19 testing, to diagnose, treat, prevent or mitigate the spread of COVID-19, which forms the basis of this action, presents a federal question under the PREP Act giving this Court original jurisdiction over the state claims asserted by Plaintiffs in the Complaint.

## C.     *Federal Question Jurisdiction Exists as the PREP Act is a Complete Preemption Statute*

41.     On its face, Plaintiffs' claims appear to sound in state law. However, Congress has already provided an exclusive remedy for Plaintiffs' "claims for loss" under the PREP Act, in the form of a no-fault compensation program and an exclusive judicial cause of action for claims of "willful misconduct."

42.     Complete preemption is "a jurisdictional rather than a preemption doctrine, [as it] confers exclusive federal jurisdiction in certain instances where Congress intended the scope of federal law to be so broad as to entirely replace any state-law claim." *Marin General Hosp. v. Modesto & Empire Traction Co.,* 581 F.3d 941, 945 (9th Cir. 2009).  Complete preemption exists when the preemptive force of federal law is

-14-

so powerful that it displaces any state law cause of action, and leaves room only for a federal claim for purposes of the "well-pleaded complaint" rule. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987). The Ninth Circuit has acknowledged that removal based on the complete preemption doctrine is appropriate where Congress has created an exclusive federal cause of action. *See In re Miles*, 430 F.3d 1083, 1088 (9th Cir. 2005).

43.    The issue of whether federal question jurisdiction exists when a plaintiff asserts a claim in state law was addressed by the Supreme Court in *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003). The Court explained:

> [A] state claim may be removed to federal court … when a federal statute wholly displaces the state-law cause of action through **complete pre-emption**. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. In the two categories of cases where this Court has found complete pre-emption … the federal statutes at issue **provided the exclusive cause of action** for the claim asserted and also **set forth procedures and remedies governing that cause of action**. *Id.* at 8 [Emphasis added; internal citations and footnotes omitted].

44.    There, the plaintiff brought an action for usury under state law, which was preempted by the usury provisions of the National Bank Act (12 U.S.C.A. §§ 85 and 86). The Court held that even though Congress did not explicitly provide for removal of preempted claims, the provisions collectively "supersede[d] both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive." *Beneficial Nat. Bank, supra,* at 11. Therefore, the Court held that federal question jurisdiction was proper under the "complete preemption" doctrine.

45.    Since the ruling in *Beneficial* in 2003, the doctrine of "complete preemption" has been applied by the federal courts to at least ten other statutes.[3] Federal

---

[3]These include the Air Transportation Safety and System Stabilization Act (*In re WTC Disaster Site*, 414 F.3d 352 (2d Cir. 2005)); the Bankruptcy Code (*In re Miles*, 430 F.3d

courts considering the issue have found "complete preemption" where a federal statute (1) expressly preempts state law and (2) creates an exclusive federal remedy for preempted state claims. *See, e.g., In re WTC Disaster Site*, 414 F.3d 352, 380 (2d Cir. 2005); *Spear Marketing, Inc. v. Bancorp South Bank*, 791 F.3d 586 (5th Cir. 2015); *Nott v. Aetna U.S. Healthcare, Inc.*, 303 F.Supp.2d 565 (E.D. Pa. 2004).

46.  Most recently, the Court in *Rachal v. Natchitoches Nursing & Rehabilitation Center, LLC*, No. 1:21-cv-334 (W.D. La. April 30, 2021), found that the PREP Act is a complete preemption statute.  (RFJN Ex. "GG".)  The *Rachal* Court found the PREP Act is analogous to Air Transportation Safety and System Stabilization Act ("ATSSSA"), which was passed following the September 11, 2011 terrorist attacks, as both statutes: (1) create an administrative no-fault compensation fund; (2) provide broad immunity from suit for certain entities/individuals; (3) create an exclusive federal cause of action for certain residual claims as the exclusive judicial remedy for damages; and (4) specifies an exclusive federal venue for suits brought under the federal cause of action. *Rachal*, at n. 3 (citing *In re WTC Disaster Site*, 414 F.3d 352 (2d Cir. 2005)).

47.  The *Rachal* court concluded that Congress intended "that the PREP Act exclusively encompass 'claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure. [42 U.S.C.] § 247d-6d(a)(1). Accordingly, to the extent Plaintiff's alleged loss [that] . . .

---

1083 (9th Cir. 2005)); the Carmack Amendment to the Interstate Commerce Act (*see, e.g., Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115 (9th Cir. 2011); the Interstate Commerce Commission Termination Act (*see, e.g., Elam v. Kansas City Southern Ry. Co.*, 635 F.3d 796 (5th Cir. 2011));  the Copyright Act (*see, e.g., Spear Marketing, Inc. v. BancorpSouth Bank*, 791 F.3d 586 (5th Cir. 2015)); the Federal Communications Act (*see, e.g., Bastien v. AT&T Wireless Services, Inc.*, 205 F.3d 983 (7th Cir. 2000)); the Federal Deposit Insurance Act (*Vaden v. Discover Bank*, 556 U.S. 49 (2009)); the Federal Railroad Safety Act (*see, e.g., Lundeen v. Canadian Pacific R. Co.*, 532 F.3d 682 (8th Cir. 2008)); the National Labor Relations Act (*see, e.g., Price v. Union Local 25*, 787 F. Supp. 2d 63 (D.D.C. 2011)); and the Securities Litigation Uniform Standards

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

1
2
3

arose out of, related to, or resulted from the administration . . . of a 'covered countermeasure,' this Court has federal question jurisdiction to apply the provisions of the PREP Act." *Id.*

4
5
6
7

48.    In *Gilbert Garcia et al v. Welltower OpCo Group LLC*, No. 8:20-cv-02250, 2021 WL 492581, *1, *6 (C.D. Cal. Feb. 10, 2021), Judge James V. Selna of the U.S. District Court for the Central District of California also ruled that the PREP Act is a complete preemption statute.

8
9
10
11
12
13
14
15
16
17

49.    The PREP Act plainly satisfies the criteria of a complete preemption statute as set forth by the Supreme Court in *Beneficial Nat. Bank*, 539 U.S. 1.  First, the PREP Act clearly preempts any state law that runs afoul of the immunity granted thereunder, as recognized in *Bruesewitz v. Wyeth, LLC*, 562 U.S. 223 (2011).  Under 42 U.S.C. § 247d-6d(a)(1), a "covered person" is afforded broad immunity "from **suit and liability** under Federal **and State law**" for "**all claims for loss** caused by, arising out of, relating to, or resulting from" the "administration" or "use" of a "covered countermeasure" if the Secretary of the HHS issues a declaration to that effect—which he has.   (Emphasis added.)  The PREP Act also expresses its clear intention to preempt state control of the issues raised, and explicitly provides as follows:

18
19
20
21
22
23
24
25
26

> During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—
> (A) is different from, or is in conflict with, any requirement applicable under this section; and
> (B) relates to the . . . distribution, sale, donation, purchase . . . or the prescribing, dispensing or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered

27
28

Act (SLUSA) (*see, e.g., Brockway v. Evergreen Intern. Trust*, 496 Fed. Appx. 357 (4th Cir. 2012)).

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

countermeasure under this section or any other provision of this chapter. . . 42 U.S.C. § 247d-6d(b)(8).

50.    The PREP Act further establishes a set of exclusive federal remedies and cause of action for all claims relating to covered countermeasures, as well as the procedures applicable to such actions/claims. Under 42 U.S.C. § 247d-6d(d)(1), "the sole exception to the immunity from suit and liability of covered persons … shall be for an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct." For claims that do not assert "willful misconduct," the exclusive remedy for relief is established under §247d-6e, which permits an individual to claim no-fault benefits through the Covered Countermeasure Process Fund for a "covered injury directly caused by the administration or use of a covered countermeasure." Simply put, state causes of action for claims relating to covered countermeasures are impermissible as a claimant must either file a claim through the established fund or a Complaint for Willful Misconduct under the PREP Act in the District Court for the District of Columbia. Thus, the PREP Act substitutes an exclusive federal cause of action and claims process in place of all state claims relating to covered countermeasures.

51.    The PREP Act further sets forth the procedures for suit. Pursuant to subsection (e)(1), titled "**Exclusive Federal Jurisdiction**," any action for Willful Misconduct must be filed in the U.S. District Court for the District of Columbia. Such claims are also subject to heightened pleading requirements (i.e., requirement that claims are to be plead pleading with particularity) and verification of and submission of a physician declaration in support of the complaint; and are assigned to a three-judge panel which has jurisdiction to consider motions to dismiss and motions for summary judgment. 42 U.S.C. § 247d-6d(e)(1), (e)(3) (e)(4) and (e)(5). Moreover, pursuant to Section 247d-6d(e)(10),

*The United States Court of Appeals for the District of Columbia Circuit shall have jurisdiction of an interlocutory appeal by a covered person*

-18-

***taken within 30 days of an order denying a motion to dismiss or motion for summary judgment based on an assertion for the immunity from suit conferred by subsection (a) or based on an assertion of the exclusion under subsection (c)(5)***.  (Emphasis added.)

For claims for no-fault benefits through the Covered Countermeasure Process Fund, 42 U.S.C § 247d-6 sets forth the procedure for obtaining such no-fault benefits.

52.     Hence, the PREP Act sets up an exclusive cause of action and/or provides for no-fault benefits for the claims asserted by Plaintiffs and the procedures governing the cause of action and/or obtaining compensation from the Covered Countermeasure Process Fund.   Thus, the PREP Act clearly satisfies the *Beneficial* test for "complete preemption."

53.     OGC Advisory Opinion 21-01, issued on January 8, 2021, which is controlling by its incorporation into the Declaration and is also entitled to *Chevron* deference, also makes clear **the PREP Act is a "complete preemption" statute**.  The Advisory Opinion states that "[t]he sine qua non of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both." (Exhibit DD to RFJN, pg. 2.)  The PREP Act has also been determined to be a complete preemption statute by a state appellate court in New York.  *See Parker v. St. Lawrence County Public Health Department*, 102 A.D.3d 140, 143-45 (N.Y. App.Div. 2012).

54.     A number of other statutes with analogous remedial structures have also been held to establish complete preemption and original federal jurisdiction:

*Labor Management Relations Act ("LMRA")*. The Supreme Court has adjudged the LMRA to be a complete preemption statute. Thereunder, any state law claims that are substantially dependent on analysis of a collective-bargaining agreement are preempted by Section 301 of the LMRA and <u>must</u> be brought in federal court. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 393 (1987). However, before an employee may bring a Section 301 claim in court, the employee must "'at least *attempt to exhaust exclusive grievance*

-19-

*and arbitration procedures* established by the [collective] bargaining agreement.'" *Campbell v. Kane, Kessler, P.C.,* 144 F. App'x 127, 130 (2d Cir. 2005) (quotation omitted) [Emphasis added].

*Employee Retirement Income Security Act ("ERISA").* ERISA, another complete preemption statute, also has a "firmly established federal policy favoring exhaustion of administrative remedies" for purposes of, *inter alia,* reducing the number of frivolous lawsuits, providing a non-adversarial method of claims settlement and minimizing the costs of claims settlement for all. *Kennedy v. Empire Blue Cross & Blue Shield,* 989 F.2d 588, 594 (2d Cir.1993); *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 445 (2d Cir. 2006).

*Air Transportation Safety and System Stability Act ("ATSSSA").* As outlined above, the Second Circuit has also applied the doctrine of complete preemption to the ATSSSA, which is structurally similar to the PREP Act. Congress passed the ATSSSA after the September 11th terrorist attacks to create an exclusive federal cause of action for damages "arising out of the hijacking and subsequent crashes" of the aircraft used in the attacks. ATSSSA § 408(b)(1), 49 U.S.C. §40101. Like the PREP Act, the ATSSSA also includes a victim's compensation fund, where a claim is filed with an appointed "Special Master", who reviews the claim to determine whether the claimant is an eligible individual under the Act. ATSSSA § 405, 49 U.S.C. §40101. Claims are limited under the fund and do not include punitive damages awards. Similar to the PREP Act, Congress' principal goals in enacting the ATSSSA "were to provide relief *without litigation* to individuals harmed as a result of the crashes and to *limit the liability of entities* that were likely to be sued for injuries suffered in connection with the crashes." *In re WTC Disaster Site*, 414 F.3d 352, 377 (2d Cir. 2005) [Emphasis added].[4]

---

[4] Notably, the PREP Act shares operative language with the ATSSSA. *Compare In re WTC Disaster Site*, 414 F.3d at 375-76 (discussing the breadth and meaning of the operative phrases "arising out of" "resulting from" and "relating to") *with*

*Federal Tort Claims Act ("FTCA")*. The FTCA, which is strikingly similar to the PREP Act, immunizes certain persons from liability and also provides an administrative/judicial remedial scheme for claims falling thereunder. The FTCA affords liability protection to federal employees for any negligent or wrongful acts committed while acting within the scope of their employment and provides an exclusive federal cause of action in the federal district courts against the United States under specified circumstances. Like the PREP Act, before a judicial action may be instituted, the claimant must first present the claim before the appropriate federal agency for adjudication. 28 U.S.C. § 2675. This jurisdictional requirement cannot be waived, *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005), resulting in the dismissal of claims where a claimant fails to exhaust the administrative remedies. *See, e.g., Leytman v. United States*, No. 19-3929, 2020 WL 6297440, at *2 (2d Cir. Oct. 28, 2020) (affirming dismissal of pending and unexhausted claims under FTCA for lack of subject matter jurisdiction). Indeed, the federal remedy under the FTCA, similar to the PREP Act, ensures that "decisions and conduct of federal public servants in the course of their work *will not be adversely affected by fear of personal liability* for money damages and of the burden of defending damage liability claims." *Melo v. Hafer*, 13 F.3d 736, 744 (3d Cir. 1994) (Emphasis added).

55.    Like the statutes discussed above, the PREP Act creates an exclusive federal remedy for claims falling thereunder, involving both an administrative and judicial component. 42 U.S.C. § 247d-6e; § 247d-6d(d)(e). This remedial structure was purposefully established by Congress to provide timely and uniform compensation in place of expensive and uncertain litigation, and is explicitly "exclusive of any other civil

///

---

42 U.S.C. § 247d-6d(a)(1).  *See Rachal*, No. 1:21-cv-334 (W.D. La. April 30, 2021), which found the PREP Act analogous to the ATSSSA.

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

action or proceeding for any claim or suit *[the PREP Act] encompasses* ...." 42 U.S.C. § 247d-6e(d).[Emphasis added].

56.    As set forth above, the Fifth Amendment to the PREP Act Declaration reiterates that "[t]he plain language of the Prep Act makes clear that there is **complete preemption of state law**...."  (*See* Def's EFJN Exhibit "CC"- 86 Fed. Reg. 7872, 7874). The PREP Act therefore meets the requirements for removal jurisdiction as set forth by the U.S. Supreme Court in *Beneficial National Bank v. Anderson*, *supra*, and any claim falling within its broad preemptive ambit is subject to removal under the doctrine of "complete preemption."

### D.    The PREP Act Applies Because Broadway By The Sea is a Covered Person

57.    Immunity under the PREP Act is afforded to "covered persons" which include a person or entity that is a "program planner" of a covered countermeasure, and/or a qualified person who prescribed, administered, or dispensed such countermeasure.    Under the Act, "person" includes "an individual, partnership, corporation, association, entity, or public or private corporation."  42 U.S.C. § 247d-6d (i)(2) and (5).  The term "program planner" includes persons/entities "who supervised or administered a program with respect to the administration, dispensing, . . . provision, or use of a . . . qualified pandemic product or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a [HHS Secretary's] declaration . . . ."   42 U.S.C. § 247d-6d (i)(6).

58.    A private sector employer or other person can be a "program planner" when it carries out prescribed activities.  (*See* Exhibit B to RFJN-85 Fed. Reg. 15198, 15199). The OGC has also issued a letter which provides that a "senior living community" meets the definition of a "program planner" to the extent that it supervises or administers a program with respect to the administration, dispensing, distribution, provision or use of a qualified pandemic or epidemic product, including the provision to a facility to

administer or use a covered countermeasure.  (Aug. 14, 2020 Letter from HHS Office of General Counsel to Thomas Barker of Foley Hoag, LLP, attached as Exhibit F to RFJN.) The broad definition of "program planner" was also addressed in Advisory Opinion 20-04, issued October 22, 2020, by the OGC.  (*See* Exhibit G to RFJN.)

59.    Defendant Broadway By The Sea qualifies as a "covered person" under the PREP Act.  At the time of the allegation set forth in the Complaint, Broadway By The Sea was acting as a "program planner" and "qualified person."  Broadway By The Sea is a skilled nursing facility licensed by the California Department of Public Health ("CDPH"), which employs licensed nursing personnel, including Registered Nurses and Licensed Vocational Nurses, who are authorized to prescribe, administer, or dispense the covered countermeasures set forth in Plaintiffs' Complaint (i.e., BiPAP, and PPE including facemasks, gowns, face shields, N95 masks) under the laws of the State of California.   Additionally, Broadway By The Sea is a program planner that was supervising and administering an infection control program involving the administration, dispensing, provision and use of qualified pandemic and epidemic products.

### E.    The PREP Act Applies to the Allegations in the Complaint

60.    The PREP Act is applicable with respect to a "covered countermeasure," which definition includes:

> (1) a qualified pandemic or epidemic product (as defined in § 247d-6d (i) (7)) . . . or (4) a respiratory protective device that is approved by the National Institute for Occupational Safety and Health ("NIOSH") and that the Health and Human Service Secretary determines to be a priority for use during a public health emergency declared under section 247d.  42 U.S.C. § 247d-6d (i)(1).

61.    A "qualified pandemic or epidemic product" is defined as: a drug, biologic product or device that is:

> (A)(i) a product manufactured, used, designed, developed, modified, licensed, or procured—
> (I) to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic; or
> (II) to limit the harm such pandemic or epidemic might otherwise cause;

-23-

(ii) a product, manufacture, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a serious of life-threatening disease or condition caused by a product described in clause (i); or

(iii) a product or technology intended to enhance the use or effect of a drug, biologic product, or device described in clause (i) or (ii); and

(B)(i) approved or cleared under chapter V of the Federal Food, Drug, and Cosmetic Act or licensed under section 262 of this title;

(ii) the object of research for possible use as described in subparagraph (A) and is the subject of an exemption under section 505(i) or 520(g) of the Federal Food, Drug, and Cosmetic Act; or

(iii) authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug and Cosmetic Act.

42 U.S.C. § 247d-6d (i)(7).

62.  The OGC issued an omnibus Advisory Opinion on May 19, 2020 to address questions regarding the scope of the PREP Act immunity for the COVID-19 pandemic. The Opinion summarized the requirements to meet the definition of a qualified pandemic or epidemic product noting that the product:

(1) must be used for COVID-19; and
(2) must be
    (a) approved, licensed, or cleared by FDA;
    (b) authorized under an EUA [emergency use authorization];
    (c) described in an EUI [emergency use instructions]; or
    (d) used under either an Investigational new Drug (IND) application or an Investigational Device Exemption.
    (Advisory Opinion 20-01, attached as Exhibit H to RFJN, pg. 4.)

63.  BiPAP is a type of ventilator, which is a Class II device approved or cleared by the FDA.  (*See* 21 CFR § 868.5905; see also 21 USC §360c).  The device was utilized in the treatment of Decedent's respiratory distress due to COVID-19. Thus, the subject BiPAP machine is a "covered countermeasure" under the PREP Act.

64.  The United States Food and Drug Administration has published a list of the "covered countermeasures" for which emergency use authorizations have been issued.

-24-

(*See* Exhibit I to RFJN.)   The list includes COVID-19 test kits and provides that face shields, gowns, shoe covers, non-surgical isolation gowns, surgical caps, properly labeled non-surgical masks, and certain non-NIOSH approved respirators[5] are covered by an EUA.   Surgical masks and surgical gowns are not on this list but are Class II medical devices which are cleared by the FDA for use.   *See* 21 C.F.R. § 878.4040.   The Secretary also issued a separate umbrella EUA for all surgical masks which are not FDA cleared.   (*See* Exhibit HH to RFJN.)   Thus, COVID-19 testing kits, masks, gowns face shields and other PPE are "qualified pandemic or epidemic products" and "covered countermeasures" under the PREP Act, as such products are either FDA cleared/approved or are included in an EUA.

65.   In addition, hand sanitizers are regulated by the FDA and are thus "covered countermeasures" under the PREP Act. (*See* Exhibit II to RFJN)   Clinical electric and mercury thermometers, and pulse oximeters (used to measure/monitor a patient's oxygen  saturation level) are also Class II medical devices cleared by the FDA and therefore meet the definition of a qualified pandemic product under the PREP Act.   21 CFR §§ 870.2700; 88.2910 and 880.2920.

66.   Immunity under the PREP Act "applies to **any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the** . . .   distribution . . . **purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure**."   42 U.S.C. § 247d-6d (a)(2)(B) (emphasis added).

67.   In his initial March 10, 2020 Declaration, the HHS Secretary notes that the "PREP Act does not explicitly define the term 'administration' but does assign the Secretary the responsibility to provide relevant conditions in the Declaration." (Exhibit B to RFJN- 85 Fed. Reg. 15198, 15200).   In Section IX of the Declaration, the

---

[5]   The PREP Act specifically provides that respiratory protective devices (i.e., N-95 respirator) approved by the National Institute for Occupational Safety and Health

Secretary defines "administration of a covered countermeasure" as the "physical provision of the countermeasures to recipients ***or activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients***; ***management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures***."    (Exhibit B to RFJN- 85 Fed. Reg. at 15202) (Emphasis added). Accordingly, the "administration" of countermeasures goes well beyond the simple physical provision of countermeasures to a recipient but extends to "activities related to management and operation" of countermeasure programs.

68.    In the Complaint, Plaintiffs allege that the BiPAP machine which was utilized by Bonnie Lee at Broadway By The Sea was defective. (Exhibit A to RFJN, Complaint, ¶¶ 19-21.)  Plaintiffs further allege that employees of Defendants "were not provided with necessary protective gear to prevent or reduce spread of the virus amongst the patients residing at the facility and employees used Bonnie Lee's room to change gear while knowing that various residents and staff had tested positive for the virus." (Exhibit A to RFJN Complaint, ¶¶ 53, 54.)  These claims clearly arise out of Defendants administration and use of covered countermeasures to prevent, treat or mitigate the effects of COVID-19.

69.    Plaintiffs further allege that Defendants failed to prevent Bonnie Lee from contracting COVID-19 in that Defendants failed to follow virus transmission protocols. Such a claim, by its nature, arises out of Broadway By The Sea's use, distribution, procurement and administration of covered countermeasures/qualified pandemic products (including temperature checks via electric and/or mercury thermometer, monitoring by pulse oximeter to check Bonnie Lee's oxygen saturation level, COVID-19 testing, and PPE).  These measures were used to diagnose, mitigate, prevent, treat or cure the COVID-19 virus, or to limit the harm COVID-19 might otherwise cause

("NIOSH") are covered countermeasures under the Act.

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

thereby triggering application of the PREP Act. Plaintiffs cannot allege decedent's death was due to the "failure to follow virus transmission protocols" to prevent the spread and transmission of COVID-19 without implicating the countermeasures that comprise those protocols, and which are covered under the PREP Act, such as PPE, COVID-19 testing, temperature checks via thermometer, and the monitoring of patient oxygen levels via pulse oximeter, since such measures are the main line of defense against and the centerpiece of any infection control program used to prevent and treat the spread of the virus that causes COVID-19. (*See* RFJN, Exhibits "J" through "BB").

70.    In *Garcia*, *supra*, 2021 WL 492581 *7, Judge Selna notes that "only instances of nonfeasance, i.e., where "defendant's culpability is the result of its failure to make any decisions whatsoever, thereby abandoning its duty to act as a program planner or other covered person" would complete preemption not attach." Only **"[t]otal inaction, therefore, would not be covered by the PREP Act."** *Garcia*, supra, at *7. (Emphasis added).

71.    In addition, on March 13, 2020, the California Department of Public Health ("CDPH") conducted a COVID-19 Long Term Care Facility Preparedness visit to evaluate the facility's preparedness for COVID-19 and found that Broadway By The Sea had implemented the recommended public health measures to prepare for COVID-19. Thereafter, on March 30, 2020, surveyors on behalf of the Centers for Medicare and Medicaid Services ("CMS") conducted a Focused Infection Control Survey and found that Broadway By The Sea was in compliance and had implemented the CMS and CDC recommended practices to prepare for COVID-19. As evidenced by the surveys, the facility had implemented a COVID-19 infection control/covered countermeasures program pursuant to the directives issued by the CDC, CMS and CDPH. The facility did have and was utilizing PPE, and had instituted COVID-19 testing, and other infection prevention and control measures and covered countermeasures in compliance with the applicable public health directives. (Copies of the March 13, 2020, and March 30, 2020 survey results are collectively attached to

Def's RFJN as Ex. JJ.)   Thus, the claims herein most certainly do not involve nonfeasance or total inaction but instead relate to how Broadway By The Sea implemented various covered countermeasures, including PPE, COVID-19 testing, BiPAP, and patient monitoring via temperature checks and pulse oximeter.

72.   The PREP Act was designed to apply to individuals and entities responding to public health emergencies, and provides immunity for claims involving "covered countermeasures" under the Act.   Plaintiffs' claims involve activities and decisions directly related to the delivery, distribution and dispensing of countermeasures to recipients and the management and operation of Broadway By The Sea's covered countermeasures program, including the use and administration of BiPAP, COVID-19 testing, and PPE (including the location within the facility where staff changed the PPE being utilized).

## IV.   THIS COMPLAINT RAISES SUBSTANTIAL AND IMPORTANT FEDERAL ISSUES THUS PROVIDING EMBEDDED FEDERAL QUESTION JURISDICTION OVER PLAINTIFFS' CLAIMS

73.   Federal jurisdiction is further appropriate as this state action "arises under" federal law and raises a substantial federal issue.   *See Grable & Sons Metal Products*, 545 U.S. 308. The applicability of the PREP Act poses a substantial federal issue which would serve to clarify and determine vital issues of federal law.   Federal question jurisdiction over state law claims may be sustained if the claims present a substantial, embedded question of federal law.   *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 808 (1986).   In *Grable*, the United States Supreme Court held that removal is appropriate if (1) the state law claim necessarily raises a disputed and substantial issue; and (2) a federal court may entertain the claims without disturbing federal/state comity principles.   545 U.S at 314.

74.   In his Fourth Amended Declaration, the HHS Secretary makes explicit that the PREP Act presents substantial federal legal and policy issues, and that there are substantial federal legal and policy interests within the meaning of *Grable*, in having a

-28-

unified whole-of-nation response to the COVID-19 pandemic among federal, state, local and private-sector entities.  The Secretary attests that,

> "there must be a more consistent pathway for Covered Persons to manufacture, distribute, administer or use Covered Countermeasures across the nation and the world.  **Thus, there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products v. Darue Engineering & Mfg*, 545 U.S. 308 (2005), in having a uniform interpretation of the PREP Act."**  (Exhibit E to RFJN, 85 Fed. Reg. 79194) (Emphasis added).

75.     Thus, by the express terms of the Secretary's Fourth Amended Declaration, removal is proper under *Grable* because Plaintiffs' state law claims raise a substantial issue of federal law involving the interpretation and application of the PREP Act.  Here, Plaintiffs allege that Defendants failed to prevent the decedent, Bonnie Lee, from contracting COVID-19.  Such a claim, by its nature, arises out of Broadway By The Sea's administration of covered countermeasures and invokes the PREP Act.  Thus, the federal legal and policy issues described in the Fourth Amended Declaration of the HHS Secretary control and require this Court to retain this action.

76.     Moreover, this case involves issues of national importance.   While Plaintiffs do allege State causes of action, their claims relate to Defendants' response to a national public health state of emergency, which has not been seen by this country in over a century.  The healthcare response to this pandemic was coordinated at a national level by HHS, the CDC, the FDA and CMS, and entailed the issuance of EUAs, immunity under the PREP Act, and detailed directives to healthcare providers to identify and sequester infected patients, which patients under investigation were to be tested, and the use of PPE.  Plaintiffs' Complaint raises issues with respect to Defendants' response to the COVID-19 pandemic which was coordinated at a federal level as well as the procurement, use, allocation, distribution and administration of covered countermeasures under the PREP Act, which invoke a substantial federal question

///

///

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

1  regarding the extent to which the broad immunities afforded under the PREP Act apply
2  to the conduct of Defendants.

3      77.  In addition, the application of the PREP Act raises a substantial federal
4  issue which is disputed, as required by *Grable*.  The allegations in the Complaint arise
5  out of Defendants' response to the COVID-19 pandemic and are inextricably
6  intertwined with and invoke the PREP Act and the Declarations of the HHS Secretary.
7  This Federal Court has a substantial interest in determining the application of the PREP
8  Act in this matter.  The PREP Act and its triggering immunity has been invoked in
9  exceptionally rare circumstances since it was enacted in 2005.  The PREP Act and the
10  HHS Secretary's declarations confer a broad and sweeping immunity to individuals and
11  entities fighting the COVID-19 pandemic during this declared state of emergency.  The
12  unique character of the COVID-19 virus, as well as its high communicability, required
13  the HHS Secretary to set forth an expansive declaration covering broad categories of
14  countermeasures to fight the pandemic including COVID-19 testing and PPE, all of
15  which require interpretation as to the scope and application.  Thus, there can be no doubt
16  that there is a substantial and compelling interest for the PREP Act and the Secretary's
17  Declaration to be interpreted by the federal courts.  Moreover, the federal courts are
18  uniquely and properly positioned to interpret Congressional intent and interests of the
19  federal government.

20      78.  This case also satisfies *Grable* insofar as Federal jurisdiction over
21  Plaintiffs' claims will not disturb federal-state comity principles.  As set forth by the
22  HHS Secretary in his Fourth Amended Declaration: "Through the PREP Act, Congress
23  delegated to me the authority to strike the appropriate Federal-state balance with respect
24  to particular Covered Countermeasures through PREP Act declaration." (Exhibit E to
25  RFJN-85 Fed. Reg. at 79194.)  And the plain, statutory language of the PREP Act
26  expresses a strong federal interest and a clear intention to supersede or preempt state
27  control of the issues raised by Plaintiffs' Complaint.

28  ///

79.    Congress did not intend the application of PREP Act immunity to be decided by state courts.  As such, this Court would not be disturbing or infringing on any balance of State and Federal judicial responsibilities by retaining jurisdiction.  To the contrary, the plain language of the statute seeks to assert broad federal authority over the issues arising under the Act, and seeks to eliminate all semblance of State court control.  The Secretary's Fourth Amended Declaration makes explicitly clear that there is exclusive federal jurisdiction over lawsuits involving covered countermeasures, and that this federal jurisdiction is essential to the uniform provision of a national response to the COVID-19 pandemic and the PREP Act.  (Exhibit E to RFJN- See 85 Fed. Reg. 79190).

## V.    REMOVAL IS PROPER BECAUSE THIS COURT HAS JURISDICTION UNDER THE FEDERAL OFFICER STATUTE

80.    Removal is proper under 28 U.S.C. §1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer.  Removal is appropriate under §1442(a)(1), when the removing defendant establishes that:

(a)    Defendant is a "person";

(b)    Defendant was acting under the direction of a federal officer when it engaged in the allegedly tortious conduct;

(c)    There is a causal nexus between the plaintiff's claims and the defendant's actions under federal direction; and

(d)    Defendant has raised a colorable defense based upon federal law.

*Goncalves v. Rady Children's Hospital San Diego* 865 F.3d 1237, 1244 (9th Cir. 2017).  Courts have a duty to broadly interpret Section 1442 in favor of removal, which "should not be frustrated by a narrow, grudging interpretation" of the statute.  *Ibid.* (quotations and citations omitted).

81.    This statute creates removal jurisdiction even as to cases that otherwise could not be commenced in or removed to federal court.  *See Jefferson County, Ala. v. Acker*, 527 U.S. 423, 431 (1999) (finding no diversity in a common law negligence

-31-

action against government driver who lived in same state as plaintiff); *Mir v. Fosburg* 646 F.2d 342, 344 (9th Cir. 1980).  Moreover, unlike the usual rule that removability in federal question cases must appear on the face of a well-pleaded complaint, cases may be removable under Section 1442(a) when a federal officer or agency raises a "colorable federal defense".  See *Jefferson County, Ala. v. Acker*, *supra*, 527 U.S. at 431.

82.    Here, Broadway By The Sea is a member of the nation's critical infrastructure and satisfies all elements for removal under Section 1442(a)(1). Defendant is a "person" for the purpose of the federal officer statute.  The term "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; *see also Goncalves*, *supra*, 865 F.3d at 1244.

83.    As part of the nation's critical infrastructure, Defendant, Broadway By The Sea was also acting under the direction of a federal officer when it engaged in the alleged tortious conduct.  The U.S. Supreme Court has held that the phrase "acting under" involves "an effort to *assist*, or help *carry out*, the duties or tasks of the federal superior."  *Watson v. Philip Morris Cos*., 551 U.S. 142, 152 (2007); *see also In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, 790 F.3d 457 (3d Cir. 2015).  The "acting under" requirement is broad and is to be liberally construed.  *Watson*, *supra*, 551 U.S. at 147.

84.    "[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations.  *Cf. Bakalis v. Crossland Savings Bank,* 781 F.Supp. 140, 144-145 (E.D.N.Y. 1991) (finding 'The rule that appears to emerge from the case law is one of 'regulation plus...'); *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) (finding that the "control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.'"); *see Fung v. Abex, Corp*., 816 F. Supp. 569, 572 (N.D.

-32-

Cal. 1992).   The "acting under" requirement is met when the defendant is acting pursuant to detailed and ongoing instructions from a federal officer.   *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387 (5th Cir. 1998).

85.   Defendant meets the "acting under" prong for removal based on the federal officer statute.   Here, Plaintiffs contends that the acts and omissions of Broadway By The Sea, with respect to its response to the COVID-19 pandemic, caused decedent, Bonnie Lee, to contract the virus which led to her death.

86.   Prior to the current national pandemic, regulation of nursing homes was very general in nature.   In 1987, Congress enacted legislation, known as the Nursing Home Reform Act, requiring nursing homes participating in Medicare and Medicaid to comply with certain quality of care rules and regulations.   42 U.S.C. § 1396r, 42 U.S.C. § 1395i-3 and 42 C.F.R. §§ 483.1 through 483.95.   CMS, contracts with state surveyors, including the California Department of Public Health in California ("CDPH"), to perform federal surveys to ensure that facilities accepting Medicare and Medicaid (Medi-Cal) payments comply with federal laws and regulatory requirements. (See   https://data.chhs.ca.gov/dataset/licensing-and-certification-district-offices-california)[6] Generally, and prior to the pandemic, these surveyors conducted site visits to evaluate whether facilities are in compliance with federal requirements and regulations.   See 42 U.S.C. § 1395aa; and 42 CFR § 488.10.   If CDPH surveyors found a "deficiency" in a facility's compliance with federal regulations, CDPH would issue a deficiency or citation, and on occasion use the CMS enforcement remedy of a "directed plan of correction," under which the facility would develop and submit a plan of correction, which would then be enforced on behalf of CMS by CDPH.

87.   However, in January 2020, in response to the pandemic and the national state of emergency, CMS and the CDC began issuing detailed directives to healthcare

facilities as members of the nation's critical infrastructure and as part of the coordinated national effort to respond to and contain the COVID-19 pandemic. CDPH surveyors, contracted by CMS, were supervising skilled nursing facilities with respect to all aspects of infection control and the pandemic response and ensuring strict compliance with the CMS directives. The issuance of timely and evolving guidance in response to a public health emergency was in contrast to the role of CMS before the pandemic. Prior to the pandemic, the focus was on ensuring compliance with existing regulations. However, throughout the pandemic, CMS and CDPH as its agent, specifically instructed facilities to take or not take particular clinical and operational actions in the absence of finding deficiencies that would otherwise require the facility to develop its own plan of correction. These directives included the following:

A.      Early directives to skilled nursing facilities focused on monitoring residents and staff for symptoms and protecting healthcare providers from infection due to contact with symptomatic patients. Facilities were advised to adhere to standards for infection prevention and take steps to prepare for COVID-19.

B.      In January and February, 2020, the CDC issued a number of health updates regarding the 2019 Coronavirus, as well as criteria to guide the evaluation and testing of patients under investigation ("PUI") for COVID-19. Healthcare providers were advised to identify PUI based on clinical features (i.e., fever or signs/symptoms of lower respiratory illness), travel to an affected geographic region and contact with a laboratory confirmed COVID-19 patient. Persons meeting the PUI criteria were to be tested and healthcare providers were advised to immediately notify their local or state health department in the event they were evaluating a PUI. State health departments in turn were instructed to immediately contact the CDC and complete a PUI case investigation form. Initially COVID-19 testing was conducted solely through the CDC,

---

[6] CDPH contracts with Los Angeles County to provide federal survey and certification services in the county. The surveyors are hereinafter referred to as the "CMS

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

which assisted local/state health departments in the collection, storage and shipment of specimens to the CDC.  During this time, the CDC also directed healthcare providers to use standard, contact and airborne precautions when interacting with PUI.  (*See* January 8, 2020, CDC Health Update Outbreak of Pneumonia of Unknown Etiology (PUE) in Wuhan China, a true and correct copy of which is attached as Exhibit J to Defendant's RFJN; January 17, 2020 CDC Interim Infection Prevention and Control Recommendations for Patients with Known or Patients Under Investigation for 2019 Novel Coronavirus (2019-n-coV) in a Healthcare Setting, a true and correct copy of which is attached as Exhibit K to Defendant's RFJN; January 24, 2020 CDC Interim Infection Prevention and Control Recommendations for Patients with Known or Patients Under Investigation for 2019 Novel Coronavirus (2019-n-coV) in a Healthcare Setting, a true and correct copy of which is attached as Exhibit L to Defendant's RFJN.)

C.     On February 1, 2020, the CDC issued an "Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus" to provide further instruction to healthcare providers regarding 2019-nCoV 2019 (the 2019 Novel Coronavirus, now known as COVID-19).  ***This instruction was part of the "ongoing US public health response . . . to identify and contain [the] outbreak and prevent sustained spread of 2019-nCoV in the United States"*** and addressed infection prevention and control specific to 2019-nCoV.  (*See* February 1, 2020 CDC Health Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus (2019-n-coV), attached as Exhibit M to the RFJN (emphasis added).)  In the update, the CDC noted that the first United States case was identified on January 21, 2020, and had recently traveled from Wuhan, China.  This document further provided updated directives related to screening of patients in healthcare facilities, and coordination with local health departments for testing and reporting of results.  In the update, the CDC set forth the criteria for assessing patients for COVID-19, and advised that patients who meet the criteria should

Surveyors."

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

be asked to wear a surgical mask as soon as they are identified and evaluated in a private room with the door closed, ideally an airborne infection isolation room if available. Healthcare personnel entering the room were again directed to use standard precautions, contact precautions, airborne precautions and eye protection.  Persons with a confirmed or suspected COVID-19 infection who were hospitalized were to be evaluated and cared for in a private room with the door closed, ideally an airborne infection isolation room. (*See* February 1, 2020 CDC Health Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus (2019-n-coV), a true and correct copy of which is attached to Defendant's RFJN as Exhibit M.)

D.    In January and February, the California Department of Public Health ("CDPH") issued a number of All Facilities Letters (AFLs) pushing out the information and directives issued by the CDC with respect to identification of PUI and infection prevention and control.  (*See* AFL 20-09, 20-10, 20-11, 20-13, and 20-15, true and correct copies of which are attached collectively as Exhibit N to Defendant's RFJN.)

E.    On February 6, 2020, CMS took direct action to prepare healthcare facilities for the national response to the emerging 2019 Novel Coronavirus by issuing a Memorandum to State Survey Agency Directors (i.e., CDPH).  The memo directed healthcare providers to adhere to CDC directives regarding the use of standard, contact and airborne precautions when interacting with PUI and advised facilities to have PPE measures and protocols in place.  (See February 6, 2020 CMS Memorandum QSO 20-09-ALL, a true and correct copy of which is attached as Exhibit O to Defendant's RFJN.)

F.    On February 28, 2020, the CDC issued a Health Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus (COVID-19) for healthcare providers.  The Update noted that to date there had been limited spread in the United States.  The instruction again included criteria to guide the evaluation and testing of patients under investigation ("PUI") for COVID-19.  Healthcare providers were advised to identify PUI based on clinical features (i.e., fever or signs/symptoms of lower

-36-

respiratory illness), travel to an affected geographic region and contact with a laboratory confirmed COVID-19 patient; and persons meeting the PUI criteria were to be tested. This update further added patients with fever and signs/symptoms of lower respiratory illness without an alternative explanatory diagnosis and no identified source of exposure to the list of those who should be tested. At this time, testing was being performed at state public health laboratories and the CDC. (*See* February 28, 2020 CDC Health Update and Interim Guidance on Outbreak of Coronavirus Disease 2019 (COVID-19), a true and correct copy of which is attached as Exhibit P to Defendant's RFJN.)

G.     On or about March 3, 2020, the CDC issued "Strategies to Prevent the Spread of COVID-19 in Long-Term Care Facilities (LTCF)". This publication, issued specifically to long term care facilities such as Broadway By The Sea, reiterated that standard, contact and droplet precautions with eye protection were to be used in the care of residents with an undiagnosed respiratory infection. Facilities were instructed to make PPE, including facemasks, eye protection, gowns and gloves available immediately outside the resident's room and to post signs on the door or wall outside the room of the residence to clearly describe the type of precautions needed and the required PPE. (*See* CDC "Strategies to Prevent the Spread of COVID-19 in Long-Term Care Facilities (LTCF), a true and correct copy of which is attached to Defendant's RFJN as Exhibit Q.)

H.     On March 3, 2020, the CDPH pushed the information contained in the CDC February 28, 2020 Interim Guidance and the CDC's March 3, 2020 instructions to long term care facilities in AFL 20-17. (*See* CDPH AFL 20-17, a true and correct copy of which is attached to Defendant's RFJN as Exhibit R.)

I.     On March 4, 2020, CMS issued a Memorandum to State Survey Agency Directors regarding Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in nursing homes. The State Survey Agency, as agent for CMS, was also responsible for disseminating the contents of the QSO memo to the States' nursing homes. The Memo instructed facilities to screen visitors for international travel,

-37-

symptoms of respiratory infection, and contact with someone with or under investigation for COVID-19, and to restrict entry of visitors who meet these criteria.  Facilities were advised to screen staff for the criteria as well, and that staff who meet the criteria should not report to work.  The CMS also included directions as to when to transfer a resident with a suspected or confirmed COVID-19 infection to a hospital, and under what conditions a nursing home may accept patients diagnosed with COVID-19.  CMS advised facilities to follow the available CDC guidance regarding infection prevention and control.  (*See* CMS Memo QSO 20-14-NH, a true and correct copy of which is attached as Exhibit S to Defendant's RFJN.)

J.     On March 8, 2020, the CDC issued further Updated Guidance on Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19).  The CDC advised that with the expanding spread of COVID-19, additional areas of geographic risk were being identified and the criteria for considering testing were being updated to reflect this spread.  The Update indicated that additional COVID-19 testing was becoming available in clinical laboratories pursuant to FDA Emergency Use Authorizations; and with increased access to testing, the criteria for testing was expanded to include more symptomatic persons, such as older adults (age 65 and older).  Thus, as part of the coordinated national effort to control and mitigate the spread of the pandemic, the CDC had been specifically directing which persons could be tested.  The March 8, 2020 update additionally provided detailed instructions for the collecting of specimens.  (*See* March 8, 2020 CDC Updated Guidance on Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19), a true and correct copy of which is attached to Defendant's RFJN as Exhibit "T").

K.     On March 10, 2020, the CDC issued Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings.  The publication again reiterated the directive regarding use of standard and transmission-based precautions and directed healthcare providers who enter the room of a patient with known or suspected COVID-

19 to adhere to standard precautions and use a respirator or facemask, gown, gloves and eye protection.  The CDC instructed that patients with known or suspected COVID-19 should be cared for in a single-person room with the door closed.  Airborne infection isolation rooms were to be reserved for patients undergoing aerosol generating procedures.  The March 10, 2020 CDC publication further noted that "[m]ajor distributors in the United States have reported shortages of PPE, specifically N95 respirators, facemask and gowns." Based on a local and regional situational analysis of PPE supplies, the CDC directed that facemasks were an acceptable alternative when the supply chain of respirators cannot meet the demand.  During this time, respirators were to be prioritized for situations where respiratory protection is most important. Healthcare providers were advised that available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which pose the highest exposure risk to healthcare providers.  In the publication, the CDC further advised that in the event of a shortage of medical gowns, gowns should also be prioritized for aerosol generating procedures. (*See* March 10, 2020, CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings, a true and correct copy of which is attached to Defendant's RFJN as Exhibit "U").

L.     On March 10, 2020, CMS issued a Memorandum providing an update regarding the PPE instructions issued by the CDC on March 10.  (*See* CMS Memo QSO 20-17-ALL, a true and correct copy of which is attached as Exhibit V to Defendant's RFJN).

M.     On March 11, 2020, CDPH issued an All Facilities Letter (AFL) notifying long-term care facilities of the latest CDC and CMS directives for infection control and prevention and the March 4, 2020 visitation restrictions issued by CMS. (*See* CDPH AFL 20-22, a true and correct copy of which is attached as Exhibit W to Defendant's RFJN.)  Broadway By The Sea followed these directives and the directives issued prior to this, in an effort to assist and help carry out the CDC and CMS' goal of

-39-

1  containing and responding to the pandemic.

2        N.    On March 13, 2020, President Trump declared the COVID-19

3  outbreak a national emergency.  Following this proclamation, the CDC and CMS took

4  swift action to waive restrictions and expand capacity for healthcare providers and

5  suppliers to coordinate the national response to the nationally declared state of

6  emergency.  On March 13, 2020, CMS issued revised infection control and prevention

7  directives for nursing homes to prevent the transmission of COVID-19.  In the Memo,

8  facilities were ordered to restrict visitation of all visitors and non-essential health care

9  personnel, cancel communal dining and all group activities, implement active screening

10  of residents and staff for fever and respiratory symptoms, and screen all staff at the

11  beginning of their shift for fever and respiratory symptoms.  Additional direction was

12  provided regarding patient transfers and acceptance of patients with COVID-19.

13  Facilities were ordered to continue to follow applicable CDC guidelines.  (See CMS

14  Memo QSO 20-14-NH, true and correct copies of which are attached as Exhibit X to

15  Defendant's RFJN.)

16        O.    On March 17, 2020, the CDC issued instructions to optimize the

17  supply of eye protection, isolation gowns, N95 respirators and face masks, which

18  provided a series of specific directives relating to the use of PPE based on whether the

19  facility was in conventional capacity (normal operation), contingency capacity

20  (experiencing temporary expected PPE shortages), or crisis capacity (involving periods

21  of known PPE shortages necessitating strategies that are no commensurate with standard

22  U.S. standards of care).  For facilities in contingency capacity, the CDC directed that

23  extended use of facemasks should be implemented and that the use of facemasks should

24  be restricted for use by healthcare providers rather than patients for source control.

25  During crisis capacity, facilities were to prioritize facemask use during activities where

26  prolonged face-to face or close contact with a potentially infectious patient is

27  unavoidable, exclude healthcare providers at higher risk for severe illness from COVID-

28  19 from contact with known or suspected COVID-19 patients, use a face shield with no

-40-

mask, and in settings where facemasks were not available, use homemade masks.  In one document pertaining to optimizing the use of N95 respirators, the CDC instructed that (1) if the healthcare provider was to remain six feet away from a symptomatic patient, no facemask or N95 respirator was required; (2)  if the healthcare provider was to be within three to six feet of a symptomatic patient, a facemask should be used; and (3) if the healthcare provider was to be within three feet of a symptomatic patient including providing direct patient care, an N95 respirator should be used if available.  When an N95 respirator was not available, healthcare providers were instructed to wear a surgical mask and exclude healthcare providers at higher risk from severe illness from contact with an infectious patient.  (True and correct copies of these documents are attached collectively to Defendant's RFJN as Exhibit Y.)

P. On March 20, 2020, CMS issued a memo entitled Prioritization of Survey Activities.  In the Memo, CMS advised that CMS surveyors would be conducting targeted infection control surveys of providers identified in collaboration with the CDC and the HHS Assistant Secretary for Preparedness and Response to ensure providers are implementing actions to protect the health and safety of individuals to respond to the COVID-19 pandemic.  (*See* a true and correct copy of CMS Memo QSO 20-20-ALL, attached as Exhibit Z to Defendant's RFJN.)  A skilled nursing facility would be subject to citation, and fines for failure to implement the directives from CMS. **Thus, the directives from CMS (which followed and instructed facilities to follow the CDC guidance) were mandates**, not recommendations.

Q. On March 21, 2020, the CDC issued further guidance specifically aimed at long term care facilities entitled "Preparing for COVID-19: Long-term Care Facilities Nursing Homes."  In this publication, nursing homes were told to restrict visitation, restrict all volunteers and non-essential healthcare personnel, cancel group activities and communal dining, implement active screening of residents and healthcare providers for fever and respiratory symptoms, and make PPE available in areas where resident care is provided and place a trash can near the exit inside the resident's room so

staff can discard PPE prior to exiting.  The CDC further directed that residents with known or suspected COVID-19 do not need to be placed in an airborne infection isolation room (AIIR) but should ideally be placed in a private room with their own bathroom.  Room sharing might be necessary if there are multiple residents with known or suspected COVID-19.  As roommates of symptomatic residents might already be exposed, it is generally not recommended to separate them in this scenario."  (*See* the March 21, 2020, CDC publication entitled "Preparing for COVID-19: Long-term Care Facilities Nursing Homes," a true and correct copy of which is attached to Defendant's RFJN as Exhibit "AA").

R.    On April 2, 2020, CMS issued new guidelines aimed at long-term care facilities to "mitigate the spread" of COVID-19.  (See Exhibit BB to RFJN- April 2020 CMS COVID-19 Long Term Care Facility Guidance.)  In doing so, CMS noted that "[l]ong-term care facilities are a critical component of America's healthcare system."  CMS stated that "CMS and CDC have worked together to swiftly issue unprecedented targeted direction to the long-term care facility industry, including a general prohibition of visitors implemented on March 13, 2020, as well as strict infection control and other screening recommendations."  CMS further noted that the CDC and CMS were providing "critical, needed leadership for the Nation's long-term care facilities to prevent further spread of COVID-19" and that long term care facilities were to immediately implement symptom screening for all persons (residents, staff, visitors, outside healthcare workers, vendors, etc.) entering a long term care facilities. Facilities were ordered to specifically ask about COVID-19 symptoms and to check the temperature of all visitors, as well as limit access points and ensure that all accessible entrances have a screening station.  Every resident was also to be assessed for symptoms and have their temperature checked every day, and patients and residents entering facilities screened for COVID-19 through testing, if available.  CMS ordered facilities to ensure all staff were using appropriate PPE when interacting with residents to the extent PPE was available and per CDC guidance on the conservation of PPE.  CMS further

directed long term care facility staff to wear a facemask while in the facility for the duration of the state of emergency, to wear full PPE for the care of any resident with known or suspected COVID-19, and if COVID-19 transmission occurs in the facility, healthcare personnel were to wear full PPE in the care of all residents irrespective of COVID-19 diagnosis and symptoms.  Further, to avoid transmission within long-term care facilities, the facilities were advised to use separate staffing teams for COVID-19 positive residents to the best of their ability, and to work with State and local leaders to designate separate facilities or units within a facility to separate COVID-19 negative residents from COVID-19 positive residents and individuals with unknown COVID-19 status.  (A true and correct copy of this April 2, 2020 CMS Directive is attached to Defendant's RFJN as Exhibit "BB.")

88.    This case involves a full-blown national health emergency and efforts made by the federal government in targeting the nation's healthcare industry—in particular, nursing facilities that are part of the nation's critical infrastructure—to help carry out this important goal, which is distinct from the typical regulator/regulated relationship described in *Watson*. *Cf. Watson,* 551 U.S. 142, 157.  Nursing facilities are part of the critical national healthcare infrastructure and were among the first responders to the national COVID-19 pandemic. They manned the front lines of the pandemic during its most critical phases and where the danger to the public and to themselves was most acute. Significant and direct oversight by the federal government was critical in the effort to combat this infectious disease outbreak. Defendant was enlisted to assist the federal government, and hence, "acted under" a federal officer or agency in fighting the COVID-19 scourge, which has been ravaging the nation and the world.

89.    Under normal circumstances, skilled nursing facilities were relatively free to operate as they saw fit, within the confines of the general regulatory scheme set out by CMS.  However, once the COVID-19 pandemic hit, skilled nursing facilities, such as Broadway By The Sea, were required to overhaul their operations and practices in order to company with the ongoing, detailed instructions and directives from CMS and CDC.

Through the federal directives issued by the CDC, CMS, and the CDPH surveyors contracted by CMS, federal authorities were making the operational decisions as it related to the clinical pandemic response in skilled nursing facilities. Facilities were ordered to restrict visitation, cancel communal dining, implement active screening and staff for fever and respiratory symptoms, screen staff at the beginning of their shift for fever and respiratory symptoms and actively take their temperature and document the absence of shortness of breath and any new or change in cough and sore throat. Facilities were instructed on which patients and staff to test for COVID-19, under what circumstances to use and how to conserve PPE, when to permit staff who had COVID-19 to return to work, and how to handle the isolation of residents infected with COVID-19 and those under investigation for COVID-19.   Skilled nursing facilities had virtually no discretion with respect to the pandemic response.

90.    Additionally, once COVID-19 began to spread, the federal government declared that healthcare providers were "critical infrastructure" businesses that were obligated to aid the federal government in preventing the spread of the virus during this unprecedented national emergency by following the federal government's direction under its close supervision. (*See* Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, CISA.gov, available at https://www.cisa.gov/sites/default/files/publications/CISA-Guidance-on-Essential-Critical-Infrastructure-Workers-1-20-508c.pdf.) Designating activities as "critical infrastructure" enabled the federal government to enlist the aid of these private parties to ensure the continued operation of the healthcare infrastructure that is "so vital to the United States that [its] incapacity or destruction . . . would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." 42 U.S.C. § 5195c(e). And when the federal government instructed these private parties on how to carry on their "critical" business during this national emergency, it enlisted them to carry out duty of the government itself to ensure the continued provision of "services critical to maintaining the national defense, continuity of

-44-

1   government, economic prosperity, and quality of life in the United States." *Id.*; 42

2   U.S.C. § 5195c(b)(3).   As acknowledged by the HHS Secretary in his Fourth Amended

3   Declaration: "COVID-19 is an unprecedented global challenge that requires a whole-of-

4   nation response that utilizes federal-, state- and local-distribution channels as well as

5   private-distribution channels [for the provision of covered countermeasures]."   (Exhibit

6   E to RFJN- 85 Fed. Reg. at 79194).

7            91.    The very detailed clinical directives and instructions provided by

8   various government agencies to the nation's critical healthcare infrastructure represented

9   a marked departure from the typical regulatory structure that existed before the

10  pandemic.  The direction and oversight is analogous to that in *Fields v. Brown*, No. 6:20-

11  cv-00475, 2021 WL 510620 at *3 (E.D. Tex. Feb. 11, 2021).  In *Fields*, Plaintiffs, former

12  employees of a Tyson meatpacking plant, alleged that Defendants failed to provide

13  adequate precautions to help protect employees from COVID-19 including failing to

14  provide proper personal protective equipment or implementation of social-distancing

15  measures. Defendants removed the action to federal court based on the federal officer

16  removal statute based in part on its designation as critical infrastructure.  In ruling on

17  Plaintiffs' Motion to Remand, the *Fields* Court noted that the plant was "working directly

18  with the Department of Agriculture and the [Food Safety and Inspection Service

19  ("FSIS")] to guarantee that there was an adequate food supply" during the COVID-19

20  pandemic with FSIS onsite at the meatpacking plants including those operated by Tyson

21  to ensure that they maintained operations.  Congress even allocated additional funding to

22  FSIS to help maintain presence at facilities.  The Court denied Plaintiffs' Motion finding

23  that Tyson Foods meatpacking facility was "acting under" the direction of a federal

24  officer based on Tyson's critical infrastructure designation.  *See also Wazelle v. Tyson*

25  *Foods, Inc.*, 2021 WL 2637336, fn 1.

26          92.    At all relevant times Broadway By The Sea was acting as part of the

27  nation's critical infrastructure at the specific direction of federal authorities to address

28  the on-going federal effort and national state of emergency to contain the COVID-19

pandemic, and prevent the spread of the virus.  As in *Fields*, a federal agency, CMS, was onsite at skilled nursing facilities to ensure providers were implementing actions to protect the health and safety of residents and respond to the COVID-19 pandemic. (See Def's RFJN, Exs. "Z" and "JJ.") Congress also expressly approved and supported the pervasive new role of the federal government in overseeing the operation of "critical infrastructure" skilled nursing homes by allocating additional funding to such healthcare providers under the CARES Act to accommodate critical ongoing operations in light of the pandemic. Hacienda C.H., Inc. received $860,894.00 of CARES funding to help combat the pandemic. (Def's RFJN Ex. "KK.")   All actions taken by Broadway By The Sea in preparation for and response to the COVID-19 pandemic, were taken "in an effort to assist, or help carry out, the duties or tasks" as ordered by the CDC and CMS, and CDPH surveyors (per the contract with CMS), and performed pursuant to the direct orders and comprehensive and detailed directives issued by these agencies.  Broadway By The Sea was acting at the direction of the federal government to prevent, treat and contain COVID-19 at the facility and in its care and treatment of Bonnie Lee.

93.    Next, to establish removal under the federal officer statute, Defendants must show "a causal nexus between the plaintiff's claims and the defendant's actions under federal direction." *Goncalves,* 865 F.3d at 1244.

94.    Here, Plaintiffs allege that due to the wrongful acts and omissions of Defendant, decedent, Bonnie Lee, became infected with COVID-19 during her residency at Broadway By The Sea and died due to the virus on June 4, 2020.  (*See* Exhibit A to RFJN, Complaint ¶ 2.)  Broadway By The Sea's response to the COVID-19 pandemic as it relates to the claims of Plaintiffs (i.e., the care and treatment of Bonnie Lee) was directly related to the orders and directives issued by the federal government. There is a clear causal nexus between the claims against Defendants and the actions taken by Broadway By The Sea at the direction of the federal government including, but not limited to, the direction of the CDC, FDA, and CMS, as well as by representatives of CDPH/Los Angeles County Public Health, the survey agency acting under contract with

CMS, with respect to the response to the pandemic at the facility and the administration of care to Bonnie Lee.  The nexus element is met as Broadway By The Sea was following the orders/directives of the CDC, FDA and CMS with regard to all aspects of infection control, including COVID-19 testing and the use of PPE.

95.    Lastly, Defendants meet the final requirement as they intend to assert colorable federal defenses.  For purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statue is to secure the validity of the defense may be tried in federal court.  *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  The colorable federal defense element is met where a defendant alleges its actions were justified as the defendant was complying with federal directives with respect to the alleged wrongful acts.  *See Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994); and *Mesa v. California*, 489 U.S. 121, 126-127 (1989); *see also Rural Community Workers Alliance v. Smithfield*, No. 5:20-CV-06063-DGK, 2020 WL 2145350 (W.D. Mo. May 5, 2020) (finding that compliance with federal guidelines aimed to protect employees from COVID-19 exposure served as a defense to civil liability).  Here, Defendant Broadway By The Sea was complying with federal directives and regulations issued by CMS, the CDC, and CDPH, the CMS contracted state surveyors, in responding to all aspects of the COVID-19 pandemic.

96.    As a colorable defense, Defendants also assert an immunity defense under the PREP Act as set forth at 42 U.S.C. 247d-6d(a)(1).  As set forth above in this Notice, the PREP Act is a complete preemption statute which applies to Plaintiffs' claims, and provides for immunity of "covered persons" from "suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of covered countermeasure" provided there has been a declaration issued by the Secretary of HHS with respect to such countermeasure.  On March 10, 2020, the HHS Secretary issued a Declaration invoking the PREP Act for the COVID-19 pandemic. The Declaration was

-47-

effective as of February 4, 2020.   Moreover, Broadway By The Sea is a "covered person" under the Act (*See* Exhibit B to RFJN- 85 Fed. Reg. 15198-15199).

97.     Plaintiffs' Complaint alleges that the BiPAP machine which was utilized by Bonnie Lee at Broadway By The Sea was defective. (Exhibit A to RFJN, Complaint, ¶s 19-21.)  Plaintiffs further allege that employees of Defendants "were not provided with necessary protective gear to prevent or reduce spread of the virus amongst the patients residing at the facility and employees used Bonnie Lee's room to change gear while knowing that various residents and staff had tested positive for the virus." (Exhibit A to RFJN Complaint, ¶¶ 53 and 54.)  These claims arise out of Defendants' administration and use of covered countermeasures to prevent, treat or mitigate the effects of COVID-19. Plaintiffs further allege that Defendants failed to prevent Bonnie Lee from contracting COVID-19 in that Defendants failed to follow virus transmission protocols. Such a claim, by its nature, also arises out of Broadway By The Sea's use, distribution, procurement and administration of covered countermeasures/qualified pandemic products including thermometers, pulse oximeters, PPE, and COVID-19 testing.  These measures were used to diagnose, mitigate, and prevent transmission of the COVID-19 virus, or to limit the harm COVID-19 might otherwise cause thereby triggering application of the PREP Act. Plaintiffs cannot allege decedent's death was due to the "failure to follow virus transmission protocols" to prevent the spread and transmission of COVID-19 without implicating the countermeasures that comprise those protocols, and which are covered under the PREP Act, such as PPE, COVID-19 testing, temperature checks via thermometer, and the monitoring of patient oxygen levels via pulse oximeter, since such measures are the main line of defense against and the centerpiece of any infection control program used to prevent and treat the spread of the virus that causes COVID-19.  (*See* RFJN, Exhibits "J" through "BB".)  Thus, the claims in Plaintiffs' Complaint relate to "covered countermeasures" under the PREP Act, which qualify for and trigger immunity from liability for the claims in this action.

///

**DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

98.     Accordingly, removal to federal court is proper in this case, as Defendants have established all elements for removal under the federal officer statute.

WHEREFORE, Defendants, Hacienda C.H., Inc. dba Broadway By The Sea, NAHS Southwest, Inc., and NAHS Holding, Inc., having established that this case is properly removed to Federal Court, provide notice pursuant to 28 U.S.C. § 1446, that the action pending in the Superior Court of the State of California County of Los Angeles, Case No. 21STCV20737, is properly removed to the Western Division of the United States District Court for the Central District of California, and respectfully requests that this Court exercise jurisdiction over this case.

Dated: July 19, 2021                     WILSON GETTY LLP


                                         By:   /s/ Kim S. Cruz
                                               _____
                                               William C. Wilson
                                               Colin M. Harrison
                                               Kim S. Cruz
                                               Ryan G. Canavan
                                               Evan J. Topol

                                         Attorneys for Defendants HACIENDA C.H., Inc.
                                         dba BROADWAY BY THE SEA; NAHS
                                         SOUTHWEST, INC.; and NAHS HOLDING,
                                         INC.

DEFENDANTS' NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

***Melody Biglay, et al. v. Hacienda C.H., Inc., et al.***
**Federal District Court of California, Central District**
**Case No.**
*[Removed from Superior Court of the State of California, County of Los Angeles*
*Case No. 21STCV20737]*
\*\*\*
**PROOF OF SERVICE**

I am employed in San Diego County.  I am over the age of 18 and not a party to this action.  My business address is 12555 High Bluff Drive, Suite 270, San Diego, California 92130.

On **July 19, 2021**, I served the foregoing documents, described in this action as:

- **DEFENDANTS, HACIENDA C.H., Inc. dba BROADWAY BY THE SEA; NAHS SOUTHWEST, INC.; and NAHS HOLDING, INC.'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

addressed as follows:

Richard A. Jones, Esq.
Jarrick S. Goldhamer, Esq.
Law Offices of Richard A. Jones
1820 E. 17th Street
Santa Ana, CA 92705
T: 714.480.0200
F: 714.480.0423
Email: laurie@ricjoneslegal.com
Email: jarrick@ricjoneslegal.com
*Counsel for Plaintiffs*

**[X]    BY E-MAIL or ELECTRONIC TRANSMISSION**    I caused based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, the documents to be sent to the persons at the e-mail addresses.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[X]**   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **July 19, 2021** at San Diego, California.

Tonya Jamois